## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

AMY HEATHERLY,             }
                         }
      **Plaintiff,**        }
                         }
**v.**                      }     **Case No.: 7:16-cv-00275-RDP**
                         }
**UNIVERSITY OF ALABAMA BOARD**    }
**OF TRUSTEES,**          }
                         }
      **Defendant.**

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment filed by Defendant the Board of Trustees of the University of Alabama ("UA" or "Defendant"). (Doc. # 38). The Motion is fully briefed, and the parties have filed evidentiary submissions. (Docs. # 39, 40, 48, 49, 50). After careful review, the court concludes that the Motion (Doc. # 38) is due to be granted.

## I.    Relevant Undisputed Facts[1]

Plaintiff Amy Heatherly ("Heatherly" or "Plaintiff") is employed by Defendant as the Director of Human Resources for UA. (Doc. # 40-8 at p. 39). On February 17, 2016, she filed a Complaint, seeking an injunction, equitable relief, and damages for alleged (1) sex/gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); (2) gender discrimination under Title IX, 20 U.S.C. § 1681 ("Title IX"); (3)

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

violation of the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); and (4) retaliation under Title VII, Title XI, and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) ("FLSA").[2] (Doc. # 1). The court dismissed Plaintiff's punitive damages request and retaliation claim on June 9, 2016. (Doc. # 18). Below, the court discusses the Rule 56 record related to UA's compensation structure, Heatherly's employment with UA, Heatherly's purported comparators, and the expert studies and opinions presented by the parties.

### A. UA's Compensation Structure

UA has a staff pay grade structure chart that helps to direct the pay of staff employees.[3] (Doc. # 40-6 at p. 26). UA's Compensation and Classification area, which has been under Heatherly's administration since 2006, determines the pay grade for staff jobs. (Doc. # 40-6 at ¶ 2). Under this pay policy, to determine the appropriate pay grades for staff jobs, the Compensation and Classification group examines knowledge and experience, job complexity and creativity, impact on the institutional mission, internal and external contacts, discretion exercised, physical demands, and working conditions. (*Id.* at ¶ 2, p. 17-23). After evaluating those factors and reviewing the pay grades for the jobs in the same reporting channel, the Compensation and Classification group assigns a staff job a pay grade. (*Id.* at ¶ 2). Because

---

[2] It is undisputed that Plaintiff complied with administrative prerequisites. (*See* Doc. # 1-1, 1-2, 1-3).

[3] Plaintiff claims that UA uses the Mercer System to establish pay grades and pay ranges and offers the Declaration of Heatherly as proof of this claim. (Docs. # 48 at p. 1-3; 49-1 at ¶¶ 6-16). She explains the Mercer System as follows:

> The Mercer System is a recognized job evaluation system used by many institutions of higher education. The Mercer System has two parts: properly describing and classifying a job and then rating that job for the purpose of placing it within a pay grade. Once a job is placed within a pay grade, the employee is assigned a salary within that grade.

(Doc. # 49-1 at ¶ 6). Although Defendant does not challenge Plaintiff's testimony for summary judgment purposes, it does not concede that UA uses the Mercer System and does not accept Plaintiff's description of the Mercer System. (Doc. # 50 at p. 1 n.1). Defendant also notes that Plaintiff did not mention the Mercer System in her deposition, Plaintiff's counsel did not ask any UA employee about the Mercer System, and Plaintiff's expert did not reference the Mercer System in his expert report. (*Id.* at p. 3). Notwithstanding these assertions, for summary judgment purposes, the court accepts Plaintiff's claim that UA uses the Mercer System.

each pay grade encompasses jobs performing widely different functions from multiple departments across UA, each pay grade is construed to include a wide salary range along with an associated minimum, first quartile, midpoint, third quartile, and maximum salary rates for each grade. (*Id.* at ¶ 3, p. 26). The jobs at issue in this case are classified in pay grade 62. (*Id.* at ¶ 4).

UA generally awards merit increases annually to recognize employees' job performances and contributions to the institution. (*Id.* at ¶ 5). UA's President allocates money to a merit pool that is established by applying a predetermined percentage to base salaries university-wide. (*Id.*). Next, the budget allocation for each department is decided by determining a percentage of base salaries in that department. (*Id.*). After the department heads make a recommendation for the allocation of funds based on employee performance, the department heads' supervisors review the merit decisions and may suggest adjustments, if warranted. (*Id.*).

As the Director of Human Resources, Plaintiff directly reports to Associate Vice President for Human Resources, who is currently Dr. Nancy Whittaker ("Whittaker"). (Doc. # 40-12 at ¶ 2). Whittaker's other direct reports are Travis Railsback ("Railsback"), the Director of Human Resources; David Bertanzetti ("Bertanzetti"), the Director of Benefits; and George Tutt ("Tutt"), the Director of Payroll. (*Id.*). In turn, Whittaker directly reports to Dr. Lynda Gilbert ("Gilbert"), the Vice President of Financial Affairs and Treasurer at UA. (*Id.* at ¶ 1).

Gilbert's direct reports, such as Whittaker, make recommendations to her regarding merit increases, and Gilbert approves, increases, or decreases these recommendations. (Doc. # 40-6 at ¶ 7). Gilbert does not always consider evaluations when making pay decisions because she may view an employee differently than the person conducting the employee's evaluation. (*Id.* at ¶ 9). Gilbert indicates that she examines market competition, the importance of the employee's service to UA, the number of individuals supervised by the employee, the employee's

performance, the quality of the customer service provided by the employee, and the financial responsibility of the employee's position when determining a merit increase. (*Id.* at ¶ 7). However, Plaintiff disputes that Gilbert examines market competition and performance when making these decisions. (Doc. # 48 at ¶ 9).

**B.      Heatherly's Employment with UA**

Heatherly has worked for UA during two different time periods: first, from 1995 until 2002 when she held various Human Resources positions, and, second, from September 2006 to present serving as the Assistant Director of Human Resources and later the Director of Human Resources. (Doc. # 40-8 at p. 8, 11, 108). In 1995, Heatherly applied for a job at UA as a compensation manager; however, she was ultimately hired as a compensation analyst and was responsible for evaluating positions, determining pay grades, and performing desk audits. (*Id.* at p. 8). After about a year of working as a compensation analyst, Heatherly became the Employee Relations Manager following the departure of the previous Employee Relations Manager. (*Id.*). Approximately a year later, Plaintiff was promoted to Assistant Director of Human Resources. (*Id.* at p. 9). Heatherly briefly served as the Associate Vice President of Human Resources until UA hired Charlotte Harris ("Harris") as a permanent employee to fill the role.[4] (*Id.* at p. 9-10). In September 2002, Plaintiff resigned from UA to accept a job with the City of Hoover. (*Id.* at p. 10-12).

In September 2006, Harris informed Plaintiff that UA had an opening for a position as Assistant Director of Human Resources. (*Id.* at p. 13-14, 108). Harris waived the normal recruitment process and offered Plaintiff the position immediately. (*Id.* at p. 14-15, 108). Plaintiff's starting annual salary was $76,000. (*Id.* at p. 15, 108-09). She received a raise at the

---

[4] Plaintiff did not apply to permanently fill the Associate Vice President of Human Resources position. (Doc. # 40-8 at p. 9).

end of her first six months in that position that increased her annual salary to $80,000. (*Id.* at p. 15-16, 109). As Assistant Director of Human Resources, Heatherly was responsible for the employee relations partners group, staff training and development, and recruitment and compensation. (*Id.* at p. 15). In August 2007, Plaintiff was promoted to Director of Human Resources and received a pay increase of $10,000, raising her salary to $90,000. (*Id.* at p. 17, 110). By August 2008, the following areas reported to Heatherly: Classification and Compensation, Human Resources Partners, Learning and Development, the Assistant Director of Human Resources, and the Human Resources person in facilities. (*Id.* at p. 19, 76, 140). In 2008, UA implemented a freeze on merit increases, meaning that there were no increases coinciding with the 2008 performance evaluation process. (Doc. # 40-6 at ¶ 8).

In July and August 2008, Heatherly, along with one of her direct reports Bill Wharton ("Wharton"), investigated claims made by UA employee Deborah Minor ("Minor") against her supervisor David Wilson ("Wilson"). (Docs. # 40-8 at p. 19-20, 153-54). On August 5, 2008, Heatherly and Wharton sent Minor a letter notifying her that they found her claims to be unsubstantiated and that Human Resource's investigation into the matter was concluded. (*Id.* at p. 19-20, 153-54). On August 6, 2018, Minor responded to that letter by email and asked if she needed to refile one of her complaints. (*Id.* at p. 20, 154). That same day, Heatherly responded to Minor, "We found no substantiation of your complaints . . . and therefore our inquiry has been concluded. No further communications on this matter will be responded to by Human Resources." (*Id.*). Also on that day, Wilson informed Heatherly that he wished to terminate Minor. (*Id.* at p. 20-21, 156). Heatherly told Wilson that the decision to terminate Minor was his but that Minor would inevitably take legal action to fight her termination. (*Id.* at p. 20, 22-23, 157). Heatherly provided input about the letter notifying Minor of the termination of her

employment. (*Id.* at p. 20, 157). On December 8, 2008, Minor filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") challenging her termination. (Docs. # 40-6 at ¶ 10; 40-7 at p. 253). UA later settled Minor's lawsuit. (Doc. # 40-6 at ¶ 10).

Following the Minor employment situation, Gilbert became concerned about Heatherly's judgment.[5] (Doc. # 40-6 at ¶ 11). Because of concerns with Heatherly's ability to recognize certain risks, Heatherly's job duties were reallocated effective May 1, 2009.[6] (Docs. # 40-6 at ¶ 11; 40-8 at p. 157). In her new role, Heatherly no longer supervised Human Resources Partners who were regularly involved in making employee relations decisions, and she was no longer involved in employment relations decisions. (Doc. # 40-6 at ¶ 11). Rather, she led the compensation area, was in charge of a competency modeling initiative, and assumed Human Resources duties involving affirmative action and EEOC compliance activities. (Docs. # 40-6 at ¶ 11; 40-8 at p. 157). Although Heatherly retained her title as Director of Human Resources and her salary remained the same, only Classification and Compensation reported to her. (Docs. # 40-6 at ¶ 11; 40-8 at p. 19). Railsback became Assistant Director of Human Resources and assumed the majority of Heatherly's former duties. (Docs. # 40-6 at ¶ 11; 40-8 at p. 19, 157).

In 2009, Gilbert made the determination that Heatherly should not receive a merit increase during the next merit increase process; however, that year there was a freeze on merit increases, so no employees received merit increases. (Doc. # 40-6 at ¶ 12). In 2010, Harris recommended that Heatherly receive a 3.5% merit increase, but Gilbert did not approve any

---

[5] Based on the somewhat confusing legal semantics of filing "an EEOC complaint" versus filing "a lawsuit," Plaintiff argues that Gilbert was not aware of the Minor employment situation until after Minor filed her lawsuit in January 2011. (Doc. # 48 at p. 10-11).

[6] Gilbert stated that she wanted to remove Heatherly from Human Resources but that Harris convinced her not to do so. (Doc. # 40-6 at ¶ 11).

increase in Heatherly's salary. (*Id.*). Gilbert states (and, to be clear, Plaintiff disputes) that this decision was based on Heatherly's handling of the Minor situation. (*Id.*).

In 2011, Heatherly received a 5% merit increase, which increased her salary to $94,500. (Doc. # 40-8 at p. 29, 110). In 2012, Heatherly received a 3% increase, which increased her salary to $97,335. (Docs. # 40-8 at p. 31-32; 40-9 at p. 13). In 2013, Gilbert had extra money for merit increases and asked Harris if employees in her department needed salary adjustments. (Doc. # 40-7 at p. 46). Harris recommended that three employees, including Heatherly, receive salary adjustments. (Docs. # 40-7 at p. 46, 156-57; 40-9 at p. 15-16). Specifically, Harris requested that Heatherly receive a $7,000 to $10,000 salary increase because Heatherly's salary was lower than other employees in pay grade 62 in the Financial Affairs Department. (Docs. # 40-7 at p. 47, 156-57; 40-9 at p. 15). Gilbert approved both a 3% raise and a $7,000 salary increase for Heatherly. (Docs. # 40-7 at p. 155-57; 40-9 at p. 13-15). With this raise, Heatherly's salary was increased to $107,255.08. (Docs. # 40-7 at p. 158; 40-9 at p. 13).

In the summer of 2014, Heatherly assisted in launching a new recruiting software for UA. (Docs. # 40-7 at p. 61; 49-1 at ¶ 31). After the software was implemented, Gilbert received complaints from individuals, who were both internal and external to UA, because they were not able to utilize the software. (Docs. # 40-6 at ¶ 14; 40-7 at p. 61). Gilbert called Whittaker, who by that time had become the Associate Vice President of Human Resources following Harris's retirement, and told her to fix the problem because individuals could not apply for positions at UA. (Docs. # 40-6 at ¶ 14; 40-7 at p. 61).

In August 2014, Whittaker recommended to Gilbert that Heatherly receive a 3% merit increase. (Doc. # 40-6 at ¶ 14). Gilbert did not believe that Heatherly should receive any merit increase because of Heatherly's handling of the recruiting software and complaints that Gilbert

had received about Heatherly's customer service. (*Id.*). Plaintiff counters that there are no contemporaneous records to substantiate Gilbert's claim that her handling of the software program created a debacle. (Doc. # 48 at ¶ 30). And, based upon this lack of records, Plaintiff disputes Gilbert's rationale for reducing Heatherly's suggested merit increase. (*Id.*). Ultimately, Gilbert agreed to provide Heatherly with a 1% merit increase in 2014, which increased her salary to $108,327. (Docs. # 40-6 at ¶ 14; 40-8 at p. 33, 110).

On August 18, 2014, Heatherly emailed Whittaker claiming that she had not been treated favorably in receiving a 1% merit increase when the merit increase pool was 3%. (Docs. # 40-8 at p. 33-34; 40-9 at p. 18). Heatherly noted that she had not received an evaluation for the 2013 through 2014 period and that she had not been informed of any performance issues. (Doc. # 40-9 at p. 18). She also stated that she did not believe that she was being compensated fairly compared to males. (*Id.*). After receiving the email, Whittaker met with Heatherly and explained that the 1% merit increase was a result of customer service concerns. (Doc. # 40-8 at p. 35). Heatherly next met with both Gilbert and Whittaker about her 1% salary increase, and Gilbert informed Heatherly that she had decided that Heatherly would not receive a higher merit increase because of customer service issues. (Docs. # 40-6 at ¶ 15; 40-8 at p. 35). Heatherly claims that neither Whittaker nor Gilbert gave her any specifics of what these purported customer service issues involved. (Doc. # 40-8 at p. 35).

After Heatherly's meeting with Gilbert and Whittaker, Heatherly sent an email to Gilbert and Whittaker summarizing their meeting. (*Id.* at p. 36). Gilbert and Whittaker copied and pasted Heatherly's email into a response and "edited" it to reflect their expectations of the behavior that Heatherly needed to exhibit to succeed in her position. (Docs. # 40-6 at ¶ 15; 40-8 at p. 35-36; 40-9 at p. 19-20). Specifically, Gilbert called upon Heatherly to be a "facilitator"

and "partner" with departments, rather than a "gatekeeper."[7]  (Doc. # 40-9 at p. 19-20).

However, Heatherly does not agree with all of the "edits" that Gilbert and Whittaker made to the

email.  (Doc. # 40-8 at p. 36).

In 2015, Heatherly received a 2.25% increase, which increased her salary to $110,765.

(*Id.* at p. 36, 110).  In November 2015, she received a 12.85% increase so that her salary was

$125,000.  (*Id.* at p. 37, 110).  Plaintiff received this 12.85% salary increase because Railsback

was returning to UA Human Resources (he had previously left Human Resources to work with

the UA Division of Student Affairs) and UA wanted to pay Heatherly the same salary as

Railsback upon his return to Human Resources.  (Doc. # 40-6 at ¶ 16; 40-8 at p. 37).  On August

16, 2016, Heatherly's pay was increased 2.75% to $128,438.  (Doc. # 40-8 at p. 37, 110).  On

August 16, 2017, Heatherly received a 2% increase so that her salary was $131,006.  (Doc. # 40-

6 at ¶ 16, p. 40).

Currently, Heatherly remains the Director of Human Resources over Recruitment,

Compensation and Classification, and Student Employment.  (Doc. # 40-8 at p. 39).  She does

not handle faculty recruitment or faculty compensation or classification. (Docs. # 40-8 at p. 40;

40-12 at ¶ 5).  She does recruit regional representatives, or recruiters for UA, from different

states.  (Doc. # 40-8 at p. 49).  Although she has a campus-wide role, Heatherly does not serve in

any system-wide role.[8]  (Docs. # 40-12 at ¶ 5; 40-13 at p. 14).  Heatherly describes her duties on

a day-to-day basis as follows:

> My team, they work with the departments all over campus and
> they're managing the recruitments of positions that they have that

---

[7] Plaintiff disputes that her job is to be a "facilitator."  (Doc. # 48 at ¶ 34).  She claims that her duties include "gatekeeper" roles, such as ensuring that supervisors and managers properly classify employee's positions and pay grade. (*Id.*)

[8] A system-wide role is one that includes not only UA, but also the University of Alabama at Birmingham ("UAB") and the University of Alabama at Huntsville ("UAH").  (Doc. # 50 at p. 5 n.7).

are either new or open in trying to help them locate and find
qualified, good candidates. They work with them through the
hiring process through salary negotiations. They basically brand
the University of Alabama as a place of employment or as the
place -- a good place of employment.

We also work with requests to change positions, to reclassify jobs,
to create new jobs. And then we also have the student employment
function which is involved with posting jobs for students both on
campus and off campus and the recruitment of those -- hiring of
those individuals.

(Doc. # 40-8 at p. 39). There are currently five people on Heatherly's team. (Doc. # 40-8 at p.
39).

UA usually has around 1,300 to 1,500 staff postings a year. (*Id.* at p. 40). If Heatherly
does not properly perform her job, open positions and operations could be adversely affected.
(*Id.* at p. 45). Additionally, if she misclassifies employees under the FLSA, UA could be faced
with lawsuits and regulatory fines that could range from $1,000 to $15,000 per incident. (*Id.* at
p. 46).

Heatherly has received no formal discipline while working for UA, and all of her
performance evaluations have been positive. (Doc. # 40-6 at ¶ 9). However, Tony Johnson,
UA's Assistant Director of Logistics and Support Services, has complained about disagreements
he has had with Heatherly over job classifications. (Doc. # 40-11 at p. 24-26).

C.      **Heatherly's Alleged Comparators**

Plaintiff compares her employment with UA with that of three other male employees in
the Human Resources Department: Bertanzetti, Tutt, and Railsback. (Doc. # 1 at ¶¶ 32-42).
Each of Plaintiff's male comparators are in salary grade 62, report directly to the Associate Vice
President of Human Resources, and have director-level positions. (Doc. # 39 at p. 15). The job
responsibilities and compensation of Bertanzetti, Tutt, and Railsback are explored in more detail
below.

### 1. David Bertanzetti (Director of Benefits)

On January 18, 2008, UA offered Bertanzetti a position as the Director of Benefits with a start date in March 2008. (Docs. # 40-8 at p. 41; 40-9 at p. 44; 40-18 at p. 8). Currently, Benefits, Wellness, Healthcare Insurance Administration, and the Human Resources Service Center all report to Bertanzetti. (Doc. # 40-17 at ¶ 3). In 2015 or 2016, Wellness was moved from the Academic Affairs Department to the Human Resources Department and is now under Bertanzetti. (Doc. # 40-18 at p. 11-12). Also, at some point, Healthcare Insurance Administration was also transferred to Bertanzetti. (*Id.* at p. 12-13). Since June 2009, Bertanzetti has supervised more employees than Heatherly. (Doc. # 40-7 at ¶ 17, p. 42). Throughout his employment with UA, neither Gilbert nor Whittaker have counseled, disciplined, or formally evaluated Bertanzetti. (Doc. # 40-18 at p. 26).

As the Director of Benefits, Bertanzetti is responsible for UA's in-house administration of numerous benefits programs (including medical, dental, and vision coverage) for UA's faculty and staff. (Docs. # 40-7 at ¶ 4; 40-18 at p. 16). He researches and evaluates the feasibility of new benefits programs and alternative benefit designs, is the major decision-maker in determining whether to implement new plans, is responsible for assisting in the resolution of benefit claim issues, and works with UA's third party administrators, benefits consultants, and vendors to negotiate favorable benefit-related costs and services for UA. (Docs. # 40-17 at ¶ 4; 40-18 at p. 15-16). Bertanzetti, along with the team he oversees, manages over $45.3 million in total medical costs, which cover over 11,200 employees and their dependents. (Doc. # 40-17 at ¶ 5).

Although not directly responsible for UA's day-to-day Health Insurance Portability and Accountability Act ("HIPAA") compliance, Bertanzetti ensures that UA's health plans are in

compliance with HIPAA. (Doc. # 40-18 at p. 60). Full compliance is essential because without it UA would be subject to substantial fines for HIPAA violations. (*Id.*). In addition, he is responsible for the employee assistance program and the flexible spending plans and supervises UA employees who manage these programs on a daily basis. (Doc. # 40-17 at ¶ 7). Bertanzetti also oversees UA's I-9 compliance. (Docs. # 40-17 at ¶ 9; 40-18 at p. 60). Fines range from $200 to $2,000 for each occurrence if an employer is not I-9 complaint. (Docs. # 40-17 at ¶ 9; 40-18 at p. 60).

Bertanzetti is responsible for overseeing the management of UA's retirement plan and serves on the system-wide Investment Committee with Mike Boyd ("Boyd") from UAB, Sandra Partin ("Partin") from UAH, and Jon Garner ("Garner") from the UA System. (Docs. # 40-17 at ¶ 6; 40-18 at p. 14). The Investment Committee monitors eighty funds in the retirement plan for changes that impact the plan. (Docs. # 40-17 at ¶ 6; 40-18 at p. 57). As necessary, the Committee adds funds to a watch list, removes funds from the plan, and replaces removed funds with other funds in the appropriate asset class. (*Id.*). Although other employees attend these committee meetings, Bertanzetti, Boyd, Partin, and Garner are the decision-makers on the Investment Committee and, with the assistance of Sageview's consulting services, manage UA's retirement plan assets which amount to over $2.3 billion. (Docs. # 40-17 at ¶ 6; 40-18 at p. 13-15, 57). Decisions made by the Investment Committee impact all the campuses in the UA System along with the UA System itself. (Doc. # 40-17 at ¶ 6). Bertanzetti also serves on the system-wide Benefits Committee. (Doc. # 40-17 at ¶ 10). Decisions made by the Benefits Committee impact UA, other campuses in the UA System, and the UA System itself. (*Id.* at ¶ 10).

Bertanzetti, along with the team he oversees, handled Affordable Care Act ("ACA") issues for UA for over seven years, including the implementation of ACA regulations. (Docs. # 40-17 at ¶ 8; 40-18 at p. 57). For instance, one of the issues he addressed was the 30/130 Rule which concerned an employer's obligation to offer plans to employees who work 30 hours a week or 130 hours a month. (Docs. # 40-17 at ¶ 8; 40-18 at p. 57). If the 30/130 Rule were not properly followed, UA would be subject to up to $10 million in fines. (Docs. # 40-17 at ¶ 8; 40-18 at p. 57-58). UAH and the UA System adopted the same plan that Bertanzetti and his team implemented at UA. (Docs. # 40-17 at ¶ 8; 40-18 at p. 58). Additionally, under Bertanzetti's leadership, Benefits introduced a first dollar deductible plan in order to increase the cost efficiency of UA's health plan. (Docs. # 40-17 at ¶ 11; 40-18 at p. 59). UAH and the UA System implemented this program as a result of UA's cost savings. (Docs. # 40-17 at ¶ 11; 40-18 at p. 59).

Heatherly agrees that the areas Bertanzetti oversees have a larger fiscal impact on UA, compared to the areas she oversees. (Doc. # 40-8 at p. 46). She also agrees that the financial impact that someone's position has on UA is relevant in determining whether jobs are comparable and that the oversight of approximately two billion dollars in assets is a relevant consideration for the comparability of positions. (*Id.* at p. 44-45). Likewise, Heatherly acknowledges that her job and Bertanzetti's job are "two different jobs" and that she is not qualified to perform Bertanzetti's job and he is not qualified to perform hers. (*Id.* at p. 47).

Bertanzetti's starting salary was $90,000, and his official offer letter stated, "[I]t is expected that your salary will increase to $100,000 effective August 16, 2008." (Docs. # 40-7 at p. 38; 40-9 at p. 44; 40-18 at p. 19, 27-28, 73-75). At the time Bertanzetti was hired, Heatherly was also making $90,000. (Doc. # 40-8 at p. 110). Bertanzetti did not get a $10,000 increase in

2008 or 2009; further, because no merit increases were given in 2008 or 2009, Bertanzetti also did not receive a merit increase. (Docs. # 40-6 at ¶ 8; 40-8 at p. 42; 40-9 at p. 21). In 2010, Harris recommended a 5.5% increase to raise Bertanzetti's salary to $95,000; however, Gilbert increased Bertanzetti's pay to $105,000, which included the 5.5% increase, plus the $10,000 increase that was mentioned in his offer letter signed by Harris. (Doc. # 40-6 at ¶ 18; 40-9 at p. 4). In 2011, based on Harris's recommendation, Gilbert approved a 5% salary increase (the same percentage increase that Gilbert approved for Heatherly) for Bertanzetti, which increased his salary to $110,250. (Doc. # 40-6 at ¶ 19, p. 40). In 2012, Harris recommended a 3% increase for Bertanzetti, and Gilbert increased it to 4%.[9] (Doc. # 40-18 at p. 40). In 2013, Harris recommended a $7,000 to $10,000 increase in salary for both Bertanzetti and Heatherly because their salaries were low in comparison to other employees in Financial Affairs in the same grade. (Docs. # 40-6 at ¶ 21; 40-8 at p. 32; 40-9 at p. 14-16). Due to the equity issue and Bertanzetti's strong performance, Gilbert approved a 9.1% increase to raise his salary to $125,099. (Doc. # 40-6 at ¶ 21, p. 40). Bertanzetti received a 4.8% increase for 2014, which increased his pay rate to $131,100;[10] a 2.17% increase in 2015, which brought his salary to $133,948; a 2.75% increase in 2016, which increased his salary to $137,631; and a 2% increase for 2017, which makes his current salary $140,384. (Doc. # 40-6 at ¶ 22, p. 40).

### 2. George Tutt (Director of Payroll)

Tutt has been UA's Director of Payroll since he was hired in May 2007. (Docs. # 40-6 at ¶ 23; 40-19 at p. 4). As the Director of Payroll, Tutt is responsible for managing UA's payroll

---

[9] For that same year, Gilbert reduced Harris's suggestion that Heatherly receive a 3.5% merit increase down to 3%. (Doc. # 40-7 at p. 42).

[10] Gilbert increased Bertanzetti's salary to $131,000 to make his salary the same as two other employees because she could not distinguish a difference in performance between Bertanzetti and these other two employees. (Docs. # 40-6 at ¶ 22; 40-7 at p. 59).

(faculty, staff, and student), which is approximately $400 million annually and includes monthly payroll, bi-weekly payroll, and supplemental payroll. (Doc. # 40-19 at p. 4, 11, 51). He also oversees payroll processing, payroll tax filing, processing of third-party payments for garnishments and child support, and other special projects that arise. (*Id.* at p. 4). Tutt manages numerous employees who are responsible for performing many tasks and has supervised more employees than Heatherly since August 2008. (Docs. # 40-6 at ¶ 24, p. 42; 40-19 at p. 9-14).

Tutt oversees the submission of tax reports to the federal and state governments and the filing state tax returns in approximately two dozen states that have varying filing requirements. (*Id.* at p. 39-40). He also supervises the filling and issuance of approximately 12,000 W-2 Forms that UA issues each year. (*Id.* at p. 41, 54). Additionally, Tutt is the contact person for an annual payroll audit that is conducted by PriceWaterhouseCoopers each year. (*Id.* at 36, 39). Tutt played a key role UA's 2010 implementation of a new time and attendance system and has implemented a payroll credit card program at UA. (*Id.* at p. 18-19). He also spearheaded a project to outsource employment verifications to Equifax. (*Id.* at p. 44).

If there is a misstep regarding UA's substantial payroll, which surpasses the threshold set by the IRS for deposit requirements, UA may face large liabilities and penalties. (Doc. # 40-19 at p. 36, 51). For instance, UA faces a penalty for each payroll tax deposit that is not timely filed. (*Id.* at p. 52). The annual payroll tax liability for UA is over $100 million. (*Id.* at p. 51). Heatherly agrees that her responsibilities do not have as a large of a financial impact on UA as those of Tutt. (Doc. # 40-8 at p. 48-50).

UA hired Tutt on May 21, 2007 with a starting salary of $100,000. (Docs. # 40-9 at p. 32, 40-19 at p. 8). Like Heatherly and Bertanzetti, Tutt had a zero percent increase in 2008 and 2009. (Docs. # 40-8 at p. 50; 40-9 at p. 32). In 2010, Harris recommended a 3.5% increase that

would have raised Tutt's salary to $106,605, but instead Gilbert raised Tutt's increase to 8.74%, resulting in a salary of $111,999. (Docs. # 40-6 at ¶ 26; 40-7 at p. 32-33; 40-19 at p. 17). In 2011, Tutt received a 5% raise, which increased his salary to $117,600. (Doc. # 40-7 at p. 41-42).

In 2012, Gilbert was concerned that Tutt would leave UA if Harris continued to be his supervisor. (Doc. # 40-6 at ¶ 27). Therefore, she removed Tutt from Human Resources and Harris's supervision and had him report to Whittaker, who had previously run payroll and, at that time, was the Associate Vice President for Administrative Services. (Docs. # 40-6 at ¶ 27; 40-12 at ¶ 6). Throughout the time period that Tutt reported to Whittaker (2012 and 2013), Harris did not make merit increase recommendations for Tutt. (Doc. # 40-6 at ¶ 27). In 2012, Tutt received a 5% increase. (*Id.* at ¶ 27, p. 40). And, in 2013, he received a 3% merit increase along with a $2,000 raise, which increased his salary to $127,184, because Gilbert had the funds available to do so and believed that Tutt had been doing a good job. (Docs. # 40-6 at ¶ 27; 40-7 at p. 59).

In 2014, Whittaker replaced Harris, and Tutt again reported to Human Resources. (Doc. # 40-6 at ¶ 28). That year, he received a 4.57% increase to raise his pay to $133,000. (*Id.* at ¶ 28, p. 40). In 2015, Tutt received a 2.25% increase (which was the same percentage increase that Heatherly received), which raised his salary to $135,992. (*Id.*). In 2016, Tutt received a 2.75% increase (which was the same percentage increase that Heatherly received) so that his salary was $139,732. (*Id.*). In 2017, he received a 2% increase (which was the same percentage increase that Heatherly received) to raise his salary to $142,527. (*Id.*).

### 3. Travis Railsback (Director of Human Resources)

Gilbert contacted Railsback and asked to meet with him after she (Gilbert) learned that Railsback was working out of state and looking to return to Alabama. (Docs. # 40-6 at ¶ 29; 40-

15 at p. 21). After interviewing Railsback, Gilbert contacted Harris about creating a position for him because Gilbert wanted to start outreach recruitment (rather than passive recruitment) at UA and Railsback had experience in that area. (Doc. # 40-7 at p. 18). On March 1, 2007, Railsback began his job at UA as a Senior Human Resources Generalist reporting to Harris with a starting salary of $75,000. (Docs. # 40-6 at ¶ 29; 40-14 at ¶ 2; 40-15 at p. 25, 28). In 2007, Railsback received a 3% increase, which raised his salary to $77,250. (Doc. # 40-6 at ¶ 30, p. 40). In 2008, like Heatherly, Railsback did not receive a merit increase. (*Id.* at ¶ 30). That year, Railsback changed job titles and became UA's Manager of Recruitment. (Doc. # 40-15 at p. 29). He did not receive a pay increase in relation to that job change. (Doc. # 40-14 at ¶ 4). In his new role of Manager of Recruitment, the persons working in the areas of Recruitment and the Coordinator of Student Assistance reported to Railsback. (Doc. # 40-8 at p. 19, 140).

On May 1, 2009, Railsback became the Associate Director of Human Resources and assumed many of Heatherly's job duties. (Doc. # 40-6 at ¶ 11, p. 28). With this promotion, Railsback received a pay increase from $77,250 to $85,002. (*Id.*). That amount was less than Heatherly's salary, despite Railsback's assumption of the majority of her duties. (*Id.*). Ten people (from Human Resources Partners, the Human Resources employees in Facilities, Recruitment, Student Assistant Employment, Assistant Director of Human Resources, and Human Resources Development) directly reported to Railsback. (Docs. # 40-6 at ¶ 17, p. 42; 40-8 at p. 19, 141; 40-14 at ¶ 5). Harris told Railsback that he would become a director after he had been in the job for a year. (Doc. # 40-15 at p. 32). Nonetheless, Harris did not change Railsback's title to director after a year because Harris believed that Heatherly would become upset if Railsback became a Director of Human Resources. (*Id.* at p. 33). Like the others, Railsback did not receive a merit increase in 2009. (Doc. # 40-14 at ¶ 6).

In 2010, Harris recommended a 3.5% merit increase for Railsback, which would have increased his salary to $87,977; however, Gilbert approved an 11.76% increase to raise his salary to $95,000. (Doc. # 40-7 at p. 35, 143). Gilbert gave Railsback this increase because she wanted to retain him and she heard that he was looking for other jobs on campus. (Docs. # 40-6 at ¶ 31; 40-7 at p. 35). With this raise, Railsback began earning more than Heatherly. (Doc. # 40-6 at ¶ 31). In 2011, Harris recommended and Gilbert approved a 5% increase for Railsback, and Gilbert also approved an additional $5,000 increase so that his salary was increased to $104,750. (Doc. # 40-7 at p. 41, 148).

On February 1, 2012, Railsback moved out of Human Resources and the Division of Financial Affairs to become the Executive Director of the UA Career Center. (Doc. # 40-14 at ¶ 7). Because Railsback moved to the Career Center, he was outside of Gilbert's division and her supervisory purview. (Doc. # 40-6 at ¶ 33-34). With his promotion, Railsback received a 6.44% increase, raising his salary to $111,500. (*Id.* at ¶ 33, p. 40). As the Executive Director of the Career Center, Railsback was responsible for all of UA's career centers, except for athletics, and for providing resources to students to help them obtain internships and employment opportunities. (Doc. # 40-14 at ¶ 7). His primary contacts were deans, department heads, corporate executives, and recruiters. (*Id.*). Railsback and his team hosted on-campus interviews as well as hundreds of events each year. (*Id.*). He also severed as the decision-maker on the complete rebuilding of two of UA's career centers. (*Id.*). While Railsback was the Executive Director of the Career Center, he received a 3% salary increase to $114,840 in 2012, a 3.11% increase to $118,411 in 2013, a 3.17% increase to $122,160 in 2014, and a 2.33% increase to $125,000 in 2015. (Doc. # 40-6 at ¶ 34, p. 40). For each of these years, Railsback's supervisor in Student Affairs determined his salary increases. (*Id.* at ¶ 34).

In the summer of 2015, Whittaker asked Railsback to draft a job description of the Director of Human Resources because he had previously performed most of the primary responsibilities of this position when he was Associate Director of Human Resources. (Docs. # 40-13 at p. 84-85; 40-14 at ¶ 8; 40-15 at p. 8). After the job was publicly posted and a number of candidates (including Railsback and Heatherly) were interviewed by a search committee, Railsback was hired as the Director of Human Resources effective November 16, 2015. (Docs. # 40-8 at p. 65; 40-12 at ¶ 4; 40-14 at ¶ 9). He did not receive a pay increase when he accepted the job; however, Heatherly's salary was increased to equal Railsback's salary. (Docs. # 40-8 at p. 62; 40-14 at ¶ 9; 40-15 at p. 88). Railsback has received the same salary increases as Heatherly and has had the same pay as Heatherly since he became the Director of Human Resources. (Doc. # 40-6 at ¶ 36).

As Director of Human Resources, Railsback is the point of contact and works as a liaison between Emergency Response, Threat Assessment, and Human Resources. (Docs. # 40-14 at ¶ 10; 40-15 at p. 86). He reviews policies to, among other things, ensure a work-life balance for employees. (Docs. # 40-14 at ¶ 10; 40-16 at p. 17). Additionally, he is responsible for providing leadership in the Human Resources Department's Employee Relations and Learning and Development Functions; ensuring assigned staff is appropriately trained and supported; researching, recommending, and implementing changes in UA's employee relations strategy to ensure it complies with the law; providing oversight in the application of UA policy; and offering guidance on critical employment decisions. (Doc. # 40-14 at ¶ 10). Railsback continues to supervise ten direct reports. (Doc. # 40-6 at ¶ 17, p. 42). Throughout his employment with UA, Railsback has never been counseled or disciplined and has no recollection of anyone addressing any performance issues with him. (Doc. # 40-15 at p. 27).

### D.     Expert Studies and Opinions

Both sides have retained experts and submitted expert reports as part of the briefing on the Motion for Summary Judgment. The court addresses those reports below.

#### 1.     Plaintiff's Expert (Dr. Marc Bendick)

Heatherly retained Dr. Marc Bendick ("Bendick"), an employment economist. Among other issues, Bendick has opined on whether UA paid male and female administrative employees equally when they performed work requiring equal skills, effort, and responsibility under similar working conditions and whether UA paid Heatherly equally to comparable male employees performing work requiring equal skills, effort, and responsibility under similar working conditions. (Doc. # 40-1 at p. 145-47). Bendick's methodology involved examining the following factors: (1) UA's employment practices as compared to other employers of similar size and sophistication; (2) standard Human Resources practices; (3) UA's adoption of standard Human Resources practices, including a system for classifying staff positions into salary grades; and (4) the use of annual performance evaluations. (*Id.* at p. 148-56). His methodology was also based on his conclusion that UA considers all employees in a particular pay grade to be of similar value to UA. (*Id.* at p. 44, 168).

Bendick found Bertanzetti, Tutt, and Railsback to be reasonable comparators for Heatherly. (*Id.* at p. 48-49). In his analysis, Bendick "paid a great deal of attention to the fact that [Heatherly, Bertanzetti, Tutt, and Railsback] were all in grade 62." (*Id.* at p. 45). However, he did not do an analysis comparing the skill, effort, or responsibility required to do the actual jobs performed by Heatherly, Bertanzetti, Tutt, and Railsback or otherwise consider the actual job responsibilities of these four employees. (*Id.* at p. 4, 45). He only "glanced briefly" at the depositions of Bertanzetti, Tutt, and Railsback. (*Id.* at p. 4, 36-37).

By comparing the average pay received by men and women on UA's administrative staff in salary grades 58 through 65 as of August 2014, Bendick concluded women on UA's administrative staff, on average, earned less than men on UA's administrative staff.[11] (Doc. # 40-1 at p. 166-71). In addition to analyses more generally comparing the pay of male and female employees at UA, Bendick compared Heatherly's compensation to that of Bertanzetti, Tutt, and Railsback. (*Id.* at p. 171). He expected the compensations of these to four UA employees to be very similar because of the similarity of their positions and the qualifications needed to perform those positions effectively. (*Id.*). Specifically, he found the positions of Bertanzetti, Tutt, and Railsback to be similar to Heatherly because all four work in UA's Human Resources Department, have the title of Director, report directly to UA's Associate Vice President of Human Resources, and are in salary grade 62. (*Id.* at p. 171-72). Bendick determined that during the period October 2012 through August 2016,[12] Heatherly earned substantially less than the average pay of Bertanzetti, Tutt, and Railsback in each of time periods analyzed. (*Id.* at p. 172). Bendick also concluded that, throughout this time period, UA would have to have paid Heatherly 15.4% more than it actually paid her for her to have earned the same as the average pay of Bertanzetti, Tutt, and Railsback. (*Id.* at p. 172-73).

## 2. Defendant's Experts (Dr. Toni Locklear and Dr. Mary Baker)

Defendant retained Dr. Toni Locklear ("Locklear"), an industrial psychologist, and Dr. Mary Baker ("Baker"), a labor economist, to give expert opinions in this case and respond to

---

[11] Bendick conducted two analyses comparing the average pay of men on the administrative staff to that of women on the administrative staff. (Doc. # 40-1 at p. 166-71). Both studies are based on the same assumption that he has made about salary grade 62: jobs that fall within the same pay grade require the same skills, efforts, and responsibilities. (*Id.* at p. 44, 166-71).

[12] The court notes that, from February 2012 through October 2015, Railsback did not work in UA's Human Resources Department, did not report directly to UA's Associate Vice President of Human Resources, and was an "executive director," rather than a "director." (Doc. # 40-14 at ¶¶ 7, 9). Additionally, in 2012 and 2013, Tutt reported to the Associate Vice President for Administrative Services rather than the Associate Director for Human Resources. (Docs. # 40-6 at ¶ 27; 40-12 at ¶ 6).

Bendick's expert report.  (Docs. # 40-4 at p. 3; 40-5 at p. 3, 8, 27-28).  Locklear opined that "Bendick incorrectly presumes that jobs in the same pay grade <u>necessarily</u> require equal skill, effort, and responsibility and are performed under similar working conditions" and that Bendick "fail[ed] to independently verify that administrative jobs in a given UA pay grade are substantially equal <u>or</u> that Ms. Heatherly's job is substantially equivalent to those of her male comparators."  (Doc. # 40-4 at p. 9) (emphasis in original).  Baker found that "the nature of the work performed and the level and scope of responsibilities associated with the jobs in which [Heatherly, Bertanzetti, Tutt, and Railsback] work are not alike in all pertinent respects."  (Doc. # 40-5 at p. 5-6, 11-16).

## II.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts

and all justifiable inferences are resolved in favor of the non-movant.  *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations."  *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).  As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial.  *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"  *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."  *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.    Analysis

Defendant argues that Plaintiff's EPA, Title VII, and Title IX claims are not supported by substantial evidence and are all due to be dismissed under Rule 56. (Docs. # 39, 50). The court examines the merits of each of these claims, in turn.

### A.    Plaintiff's Equal Pay Act Claim Fails as a Matter of Law

The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work. *See* 29 U.S.C. § 206(d)(1). To establish a prima facie case under the EPA, a plaintiff is required to prove "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)). An EPA plaintiff need not prove that the jobs held by her male comparators are identical to hers; instead, she must demonstrate only that the skill, effort, and responsibility required in the performance of the jobs are "substantially equal." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992).

"The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799

(11th Cir. 1989). An EPA plaintiff's burden of proving that her position is equivalent to that of her comparators is a more difficult burden than the comparison which must be made to support their Title VII claims. *See Miranda*, 975 F.2d at 1526 ("A plaintiff suing under the Equal Pay Act must meet the fairly strict standard of proving that she performed substantially similar work for less pay. . . . Under the disparate treatment approach of Title VII, however, there is a relaxed standard of similarity between male and female-occupied jobs, but a plaintiff has the burden of proving an intent to discriminate on the basis of sex (or race or national origin)."). Although formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether the compared jobs are substantially equal must be the job content and the actual duties that the employees are called upon to perform. *Id.* at 1533; *see Arrington v. Cobb Cty.*, 139 F.3d 865, 876 (11th Cir. 1998) ("[T]he controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content."); *Hodgson v. Brookhaven Gen'l Hosp.*, 436 F.2d 719, 724 (5th Cir. 1970) ("Job descriptions prepared by the employer may or may not fairly describe job content."). The skills and qualifications of the individual employees holding the compared jobs and job duties that are incidental or insubstantial (as opposed to primary duties) are not relevant to this analysis. *See Miranda*, 975 F.2d at 1533.

"Once a prima facie case is demonstrated, to avoid liability the employer must prove by a preponderance of the evidence . . . that the differential is justified by one of four exceptions set forth in the EPA . . . ." *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995). "Those exceptions are: '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Id.* (quoting 29 U.S.C. § 206(d)(1). When asserting one of these affirmative defenses, an employer bears the burden of proof, which is a heavy one. *Id.* If the defendant meets its burden,

the plaintiff must rebut the explanation by showing with affirmative evidence that the reason is pretextual or offered as a post-event justification for a gender-based differential. *Id.* If a plaintiff's rebuttal is sufficient to create an inference of pretext, a material issue exists that must be resolved at trial. *Id.*

Here, Plaintiff alleges that UA paid her less than male employees in violation of the EPA. (Doc. # 1 at ¶¶ 67-73). More specifically, she claims that UA paid her less than Bertanzetti, Tutt, and Railsback even though their jobs are substantially equal because they are all in the same pay grade. (Docs. # 1 at ¶¶ 68-70; 48 at p. 25-33). UA counters that Bertanzetti, Tutt, and Railsback are not proper comparators for Heatherly because their jobs are not substantially equal to that of Heatherly. (Doc. # 39 at p. 25-30). Below, the court explores whether Heatherly's position is substantially equal to those of Bertanzetti, Tutt, and Railsback.

### 1. UA's Alleged Use of the Mercer System Does Not Establish Substantially Equal Jobs

Plaintiff alleges that UA uses the Mercer System to evaluate jobs and that the use of this job valuation system confirms that the jobs of Heatherly, Bertanzetti, Tutt, and Railsback are substantially equal. (Doc. # 48). According to Plaintiff, the Mercer System values jobs in accordance with standards determined by UA and "establishes pay grades based upon[] knowledge and experience; job complexity and creativity; and physical demands and working conditions." (*Id.* at ¶ 3-4). Plaintiff claims that the use of the Mercer System shows "that UA considers various jobs, grouped into the same pay grade, to be equal even if those jobs are different." (*Id.* at p. 3). Plaintiff's argument misses the mark for at least three reasons.

First, binding precedent is clear that "the controlling factor under the Equal Pay Act is job content—the actual duties that the respective employees are called upon to perform." *Miranda*, 975 F.2d at 1533 (internal quotations omitted). "[A]n EPA plaintiff must show she and her

comparator hold not only similar job titles and classifications but the actual job requirements and performance requirements are substantially equal." *Kohser v. Protective Life Corp.*, No. 2:11-CV-03915-JHE, 2015 WL 1395896, at *19 (N.D. Ala. Jan. 13, 2015), *report and recommendation adopted as modified*, No. 2:11-CV-3915-VEH, 2015 WL 1395911 (N.D. Ala. Mar. 25, 2015), *aff'd*, 649 F. App'x 774 (11th Cir. 2016) (rejecting a plaintiff's argument that her job was substantially similar to her alleged male comparator because the two employees were hired at the same grade level). To decide whether a plaintiff has established a prima facie EPA violation, a court should not (and this court will not) ignore plaintiff's obligation to prove that the skill, effort, and responsibility required in the performance of the jobs are "substantially equal." *See Miranda*, 975 F.2d at at1533.

Second, Plaintiff does not offer meaningful support for her argument that a job evaluation system on its own can establish prima facie EPA violation. Plaintiff's citations to *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974), and *Washington County v Gunther*, 452 U.S. 161 (1981), does not support her argument that "[r]eliance on the results of a job evaluation system to prove an EPA violation is consistent with the [EPA]." (Doc. # 48 at p. 29). Indeed, rather than supporting Plaintiff's contention that the existence of a job evaluation system is proof of a prima facie EPA violation, *Corning Glass Works* and *Gunther* actually acknowledge that a job evaluation system may serve as a defense to an alleged EPA violation. *See Gunther*, 452 U.S. at 170-71 ("Equal Pay Act litigation, therefore, has been structured to permit employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of other factors other than sex.") (internal quotations omitted); *Corning Glass Works*, 417 U.S. at 201 ("'Thus, it is anticipated that a bona fide job classification program that does not discriminate on the basis of sex will serve as a valid defense to a charge of discrimination.'")

(quoting H.R. Rep. No. 88-309, at 3 (1963), *reprinted in* 1963 U.S.C.C.A.N. 687, 689). Similarly, Plaintiff misses the target when she references non-binding precedent in support of her position that UA's job evaluation/pay grade system is proof of an EPA violation. (Doc. # 48 at p. 29-30). For instance, Plaintiff cites *Belfi v. Prendergast*, 191 F.3d 129, 136 (2d Cir. 1999). In *Belfi*, the Second Circuit affirmed a district court's finding that the plaintiff had established a prima facie case under the EPA because the plaintiff and her comparators were all employed as office engineers in positions that required equal skill, equal effort, and equal responsibility. 191 F.3d at 136. But, the court did not consider the defendant's salary plan as a basis for its prima facie finding. *See id.* In *Belfi*, the court found that the defendant had proffered gender-neutral explanations as affirmative defenses to the plaintiff's prima facie case and, thus, the plaintiff had the burden to establish pretext. *Id.* at 137. To establish pretext, the plaintiff pointed to, among other factors, defendant's salary plan. *Id.* The court found that the district court incorrectly resolved questions of fact relating to pretext and that the defendant's own explanation of the salary disparity in relation to a shift in its salary plan created a question of fact. *Id.* This analysis is of no help to Plaintiff here.

Third, Plaintiff acknowledges that UA's pay grades include wide salary ranges and that employees within each pay grade may receive varying salaries based on their different functions. (Docs. # 39 at ¶ 4; 40-6 at p. 26; 48 at ¶ 4). For instance, the 2016-2017 staff pay grade structure lists the minimum annual salary for staff in pay grade 62 as $70,907 and the maximum as $134,722. (Doc. # 40-6 at p. 26). This fact directly contradicts Plaintiff's statement that "[b]y using the Mercer System, UA has determined that when jobs fall within the same pay grade it is because, overall, they require equal work and, therefore, deserve equal pay." (Doc. # 30 at p. 48). Assuming, for summary judgment purposes, that UA uses the Mercer System to determine

pay grades, the range of salaries within each pay grade show that an employee's categorization into a pay grade does not pinpoint that employee's exact salary and that multiple employees within the same pay grade may have and earn varying salaries. For these reasons, the court does not accept Plaintiff's argument that the Mercer System or UA's pay grades show a prima facie EPA violation. Instead, the court follows binding precedent and evaluates the content of Heatherly's job with those of her alleged comparators below.

## 2. Heatherly's Position Is Not Substantially Equal to that of Bertanzetti or Tutt

A comparison of the job content and primary duties of Heatherly, Bertanzetti, and Tutt show that their positions involve varying skills, efforts, and responsibilities.[13] As the Director of Benefits, Bertanzetti oversees the in-house administration of UA's many benefit programs, including medical coverage, flexible spending plans, health insurance, life insurance, and the management of UA's retirement plan. (Docs. # 40-8 at p. 40-41; 40-17 at ¶¶ 3-6; 40-18 at p. 13-16, 57, 60). Unlike Heatherly, Bertanzetti is involved in system-wide roles. (Docs. # 40-8 at p. 46; 40-17 at ¶¶ 6, 10). Heatherly acknowledges that her job and Bertanzetti's job are "two different jobs" and that she is not qualified to perform Bertanzetti's job. (Doc. # 40-8 at p. 47).

As the Director of Payroll, Tutt is responsible for managing UA's payroll (faculty, staff, and student) and overseeing payroll processing, tax filings, and tax reports, among other duties. (Doc. # 40-19 at p. 4, 11, 36, 39-41, 51, 54). Heatherly's position as the Director of Human Resources does not overlap (and has never overlapped) with Benefits or Payroll. (*See* Doc. # 40-

---

[13] Although Plaintiff has offered expert testimony stating that Bertanzetti, Tutt, and Railsback are reasonable comparators for Heatherly, her expert also admitted that he did not compare the skill, effort, or responsibility required to do the jobs performed by Heatherly, Bertanzetti, Tutt, and Railsback or otherwise consider the actual job responsibilities of these employees. (Doc. # 40-1 at p. 4, 45, 48-49). Accordingly, Plaintiff's expert testimony does not support her contention that Bertanzetti, Tutt, and Railsback are her comparators. *See Miranda*, 975 F.2d at 1533 (explaining that a plaintiff must demonstrate that the skill, effort, and responsibility required in the performance of the compared jobs are substantially equal).

8 at p. 45-50, 76-93). Rather, Heatherly's primary duties currently involve recruitment and employee (but not faculty) classification and compensation, and her duties have also previously included oversight of Human Resources Partners, Learning and Development, and Human Resources Facilities. (Doc. # 40-8 at p. 19, 39-40, 76, 140, 157).

In addition to having positions that involve different primary job duties from those of Heatherly, both Bertanzetti and Tutt have more direct reports than Heatherly[14] and work with faculty, unlike Heatherly. (Docs. # 40-6 at ¶ 24, p. 42; 40-7 at ¶ 17, p. 42; 40-8 at p. 43; 40-12 at ¶ 5). Furthermore, Plaintiff agrees that both Bertanzetti's and Tutt's positions have larger fiscal impacts on UA than her position does. (Doc. # 40-8 at p. 46, 48-50). Because a reasonable jury could not find that the positions of Heatherly, Bertanzetti, and Tutt are substantially equal, Plaintiff has not met her high standard for establishing that Bertanzetti and Tutt are her comparators and has also failed to establish a prima facie EPA case in relation to UA's employment of Bertanzetti and Tutt. *See Corning Glass Works*, 417 U.S. at 195; *Waters*, 874 F.2d at 799.

### 3. Heatherly's Position Is Not Substantially Equal to that of Railsback

Plaintiff alleges that UA has paid her less than Railsback for work requiring equal skill, effort, and responsibility in violation of the EPA. (Doc. # 1 at ¶ 70). As explained below, there is a limited timeframe where such a violation is viable. Railsback began earning a higher salary than Heatherly on August 16, 2010. (Doc. # 40-6 at p. 40). From February 1, 2012 through November 15, 2015, Railsback worked outside of the Human Resources Department in UA's Career Center, which is in UA's Division of Student Affairs. (Doc. # 40-14 at ¶¶ 7, 9). Throughout those dates, the primary duties Railsback performed as the Career Center Executive

---

[14] Bertanzetti has supervised more employees than Heatherly since June 2009, and Tutt has supervised more employees than Heatherly since August 2008. (Docs. # 40-6 at ¶ 24, p. 42; 40-7 at ¶ 17, p. 42).

Director were distinct from the primary duties Heatherly was performing as the Director of Human Resources. More specifically, as the Career Center Executive Director, Railsback was responsible for all of UA's career centers, except for athletics, and for providing resources to students to help them obtain internships and employment opportunities. (Doc. # 40-14 at ¶ 7). Whereas, Heatherly was responsible for managing the recruitments of various position openings and classifying positions. (Doc. # 40-8 at p. 39, 86-91). On November 16, 2015, when Railsback returned to Human Resources as a director, Heatherly's income was increased to match that of Railsback. (Docs. # 40-8 at p. 62; 40-15 at p. 89). Railsback has received the same salary increases as Heatherly and has had the same pay as Heatherly since he became the Director of Human Resources on November 16, 2015. (Doc. # 40-6 at ¶ 36). Accordingly, the court limits its EPA analysis to the timeframe of August 16, 2010 (the date Railsback's salary surpassed Heatherly's salary) through January 31, 2012 (Railsback's last day as the Associate Director of Human Resources before becoming the Career Center Executive Director).

When Railsback became the Associate Director of Human Resources on May 1, 2009, he assumed the majority of Heatherly's duties.[15] (Docs. # 40-6 at ¶ 11, p. 28; 40-8 at p. 19; 40-14 at ¶ 5). Human Resources Facilities, Human Resources Partners, Assistant Director of Human Resources, and Human Resources Development were all transferred away from Heatherly to be under Railsback. (Docs. # 40-8 at p. 19, 81-82; 40-14 at ¶ 5). In addition, Railsback continued to oversee Recruitment and Student Assistant Employment. (Docs. # 40-8 at p. 19, 81-82; 40-14 at ¶ 5). From May 1, 2009 at least until Railsback's departure from Human Resources in January 2012, Heatherly only remained in charge of Classification and Compensation. (Docs. # 40-6 at

---

[15] At this time, Railsback received a pay increase with his promotion from $77,250 to $85,002, which was less than Heatherly's salary. (Doc. # 40-6 at ¶ 11).

¶ 11; 40-8 at p. 19, 82-85). Throughout this time period, Railsback had ten to twelve direct reports, whereas Heatherly only had one. (Doc. # 40-6 at p. 42).

With such a significant difference in the higher amount of responsibilities Railsback had as compared to Heatherly, and given the additional effort of overseeing (at least) ten individuals as opposed to one, the Rule 56 record is clear: a reasonable trier-of-fact could not conclude that Railsback's position as the Associate Director of Human Resources was substantially equal in responsibility or effort as compared to Heatherly's position as Director of Human Resources, despite the positions' respective titles. *See* 29 C.F.R. § 1620.16(a) ("Effort is concerned with the measurement of the physical or mental exertion needed for performance of a job. Job factors which cause mental fatigue and stress, as well as those which alleviate fatigue, are to be considered . . . . "); 29 C.F.R. § 1620.17(a) ("Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation."). Although Heatherly's formal title as "Director of Human Resources" sounds more substantial than Railsback's formal title of "Associate Director of Human Resources," the job content and actual duties that Railsback performed as Associate Director encompassed more responsibilities and required more effort than Heatherly's position. *See Arrington*, 139 F.3d at 876 ("[A]lthough formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content."). As such, the court finds that Plaintiff has not presented substantial evidence that her position was substantially equal to that of Railsback and she has failed to present a prima facie EPA case. Because Plaintiff has failed to establish a prima facie EPA case against UA, her EPA claims are due to be dismissed.

**B.      Plaintiff's Single-Motive Title VII Claim Fails as a Matter of Law**[16]

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Because Plaintiff does not contend that there is any direct evidence to support her Title VII claim, this single-motive claim must be evaluated under the *McDonnel Douglas* scheme, which requires a plaintiff to initially shoulder the burden of proving by a preponderance of evidence a prima facie case of discrimination.  *See, e.g.*, *Dent v. Fed. Mogul Corp.*, 129 F. Supp. 2d 1311, 1314 (N.D. Ala. 2001); *Ritchey v. S. Nuclear Operating Co., Inc.*, No. 2:07-cv-01844-RDP, 2010 WL 11520488, at *10 (N.D. Ala. Mar. 29, 2010), *aff'd*, 423 F. App'x 955 (11th Cir. 2011).  "In order to establish a prima face case, a plaintiff must present 'evidence adequate to create an inference that an employment decision was based on an [illegal] discriminatory criterion . . . .'"  *Dent*, 129 F. Supp. 2d at 1314 (N.D. Ala. 2001) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)).  Furthermore, a plaintiff must show "(1) that she is a member of a protected class; (2) that she was qualified for her job; (3) that she suffered an adverse employment action; and (4) that her employer treated similarly situated employees who are not members of the protected class more favorably."  *Wood v. K-Mart Corp.*, 273 Fed. App'x 806, 807 (11th Cir. 2008) (citing *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000)).

In this case, Defendant argues that summary judgment is appropriate for Plaintiff's Title VII single-motive claim because she has failed to establish the forth element: the existence of a

---

[16] "Discrimination claims brought under Title VII . . . are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).  In this case, because it is unclear whether Plaintiff is alleging a mixed-motive Title VII claim or both a mixed-motive and a single-motive Title VII claim, the court separately examines each of these claims below.

similarly situated employee. (Doc. # 39 at p. 33-36). While wage discrimination is forbidden under both Title VII and the EPA, a Title VII plaintiff's task of establishing a prima facie case is in some respects easier because she is not required to meet the exacting burden of showing substantial equality of jobs.[17] *Gunther*, 452 U.S. at 170-71, 181. Of course, under Title VII case law, Plaintiff does have the burden of showing that she and the alleged comparator employees are similarly situated in all relevant respects. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "That is, the plaintiff's comparators must perform the same type of tasks that the plaintiff performs at work." *Davis v. Dunn Const. Co.*, 872 F. Supp. 2d 1291, 1310 (N.D. Ala. 2012). "'The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.'" *Gaines v. Johnson*, 44 F. Supp. 3d 1169, 1178 (N.D. Ala. 2014) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)). When determining whether an individual is a proper comparator, courts examine the amount of years an individual has worked for the employer, the type of expertise the individual has, and the supervisor of the alleged comparator versus that of the plaintiff, among other factors. *See Davis*, 872 F. Supp. 2d at 1310; *see also Gaines*, 44 F. Supp. 3d at 1178. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562.

If, on the other hand, a plaintiff establishes a prima facie case, an employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. Analysis of whether the employer has met this burden emphatically involves no credibility determination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). An employer's burden in providing a legitimate reason is "exceedingly light." *Perryman v. Johnson*

---

[17] At the same time, however, the plaintiff has the additional Title VII burden to prove that the defendant intended to discriminate against her on the basis of sex. *Miranda*, 975 F.2d at 1526.

*Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). After an employer articulates one or more legitimate, nondiscriminatory reason for the employment action, a plaintiff must show that the proffered reason was a pretext for illegal discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot simply recast the reason, but must "meet that reason head on and rebut it." *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024-25.

Here, Plaintiff alleges that Bertanzetti, Tutt, and Railsback are similarly situated employees and that there is evidence of pretext. (Docs. # 1 at ¶ 53-54; 48 at p. 37-40). Plaintiff points to Bendick's study as evidence that UA discriminates against female employees. (Doc. # 48 at p. 37-38). However, Bendick's analyses do not compare job duties and do not indicate whether Plaintiff is similarly situated to other employees; rather, these analyses are based on the unsupported assumption that jobs within each pay grade are comparable. (Doc. # 40-1 at p. 44, 168). This statistical evidence "does not have any probative value in establishing a prima facie case of disparate treatment." *Wilson*, 376 F.3d at 1089; *see Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997) ("Statistics without an analytic foundation are 'virtually meaningless.'"). As explained below, even under the more lenient Title VII standard, Plaintiff has failed to establish that her alleged comparators are similarly situated employees.

### 1.      Bertanzetti and Tutt Are Not Similarly Situated Employees

Although (for the most part) the positions of Bertanzetti and Tutt have been housed in the Human Resources department (like Heatherly's position), and all three of them have "director"

titles, Bertanzetti and Tutt have completely different roles that require different levels of expertise as compared to Heatherly. While Heatherly performs duties related to recruitment and classification, Bertanzetti performs tasks centered around employee benefits and Tutt performs tasks centered around payroll. (Docs. # 40-8 at p. 19, 39-41, 76, 140, 157; 40-17 at ¶¶ 3-6; 40-18 at p. 13-16, 57, 60; 40-19 at p. 4, 11, 36, 39-41, 51, 54). Furthermore, Heatherly's position does not overlap (and has never overlapped) with Benefits or Payroll. (*See* Doc. # 40-8 at p. 45-50, 76-93). Ultimately, the Rule 56 evidence shows that Bertanzetti and Tutt do not "perform the same type of tasks that [Heatherly] performs at work" and, furthermore, that Bertanzetti and Tutt are not proper comparators for Heatherly. *See Davis*, 872 F. Supp. 2d at 1310.

## 2. Railsback Is Not a Similarly Situated Employee

Likewise, Plaintiff has not shown that Railsback was a similarly situated employee. From February 1, 2012 through November 15, 2015, Railsback worked outside of the Human Resources Department under a different supervisor in UA's Career Center, where he performed completely different tasks than Heatherly that were related to Student Affairs, not Human Resources. (Docs. # 40-8 at p. 39, 86-91; 40-14 at ¶¶ 7, 9). Accordingly, during this time frame, Railsback is plainly not a proper comparator. *See Davis*, 872 F. Supp. 2d at 1310 ("[H]aving different supervisors may weigh against a finding that the individuals are similarly situated."). Once Railsback returned to Human Resources as a director in November 2015, Heatherly's income was increased to match that of Railsback, and, since that date, the two have had the same salary increases and pay. (Doc. # 40-6 at ¶ 36). Because Heatherly and Railsback have had equal pay since November 2015 and the two were in different departments performing completely different roles from February 2012 through November 2015, the timeframe to consider is between August 16, 2010 (the date Railsback's salary surpassed Heatherly's salary)

through January 31, 2012 (Railsback's last day before becoming the Career Center Executive Director).[18]

Throughout this time frame, Railsback served as the Associate Director of Human Resources and had assumed the majority of Heatherly's duties. (Docs. # 40-6 at ¶ 11, p. 28; 40-8 at p. 19; 40-14 at ¶ 5). While Heatherly oversaw one group (Classification and Compensation), Railsback oversaw multiple groups (Human Resources Facilities, Human Resources Partners, Assistant Director of Human Resources, Human Resources Development, Recruitment, and Student Assistant Employment). (Docs. # 40-6 at ¶ 11; 40-8 at p. 19, 81-85; 40-14 at ¶ 5). While Heatherly had one direct report, Railsback had ten to twelve. (Doc. # 40-6 at p. 42). With such a vast difference in responsibilities and job duties, Railsback and Heatherly cannot be said to have had "the same type of tasks" or "nearly identical" roles during this time period. *See Gaines*, 44 F. Supp. 3d at 1178; *Davis*, 872 F. Supp. 2d at 1310. Furthermore, "it is clear that [Railsback was] required to perform a significant amount of duties beyond" what Heatherly was required to perform. *Rollins v. Alabama Cmty. Coll. Sys.*, 814 F. Supp. 2d 1250, 1283 (M.D. Ala. 2011). Because Plaintiff has failed to show the existence of a similarly situated employee, summary judgment is appropriate on her single-motive Title VII claim. *Holifield*, 115 F.3d at 1562.

### 3. Plaintiff Has Failed to Establish Pretext

Even assuming Plaintiff could establish a prima facie case of wage discrimination (and, to be clear, she cannot), Defendant's Motion is due to be granted on her Title VII claims for a

---

[18] Defendant argues that, under the Fair Pay Act of the 2009, the relevant period begins in October 2012 because Plaintiff filed her EEOC Charge in October 2014. (Doc. # 39 at p. 34-35). However, the court need not (and does not) explore this argument because, as explained below, the court finds that Railsback was not a similarly situated employee to Heatherly when he was the Associate Director of Human Resources.

separate reason: she cannot show that the reasons Defendant has articulated for the pay disparities are a pretext for sex discrimination.

Defendant argues that, even if Plaintiff establishes a prima facie case, it had legitimate, nondiscriminatory reasons for its decisions related to Heatherly's salary increases. (Doc. # 39 at p. 34-36). The court agrees with Defendant. The undisputed Rule 56 evidence regarding the different job responsibilities (and increased financial responsibilities) of Bertanzetti and Tutt as compared to Heatherly. These considerations along with the Rule 56 record about what Defendant perceived as missteps by Heatherly concerning both the Minor incident and the recruiting software launch could motivate a reasonable employer to pay an employee less than she would have been paid if she had performed more proficiently in those areas. *See Chapman*, 229 F.3d at 1030. That is, if Heatherly had not mishandled the Minor situation, she would have received a merit increase in August 2010. Further, the undisputed evidence suggests that it was that lapse which opened the door for Railsback to assume the substantial portion of Heatherly's duties and for him to receive a commensurate pay increase. Similarly, the record shows that Railsback received a higher merit increase than Heatherly in 2014 because of his better performance compared to Heatherly's customer service issues. (Of course, those two have been paid the same since November 2015 and Railsback's 2012 through 2015 salary increases were decided upon by a different group of decision-makers). For all these reasons, Plaintiff has not met UA's proffered reasons for the pay discrepancies "head on and rebut[ted]" them. *See Chapman*, 229 F.3d at 1030. As such, the court finds that Plaintiff has failed to provide sufficient evidence to create a genuine issue of material fact regarding whether UA's articulated reasons are pretextual. *See id.* at 1024-25.

### C.      Plaintiff's Mixed-Motive Title VII Claim Fails as a Matter of Law

Defendant argues that Plaintiff has improperly asserted a mixed-motive claim for the first time in her brief opposing summary judgment and that she did not give notice of such a claim in her Complaint.  (Doc. # 50 at p. 10).  Confusingly, Defendant cites *Potts v. City of Bessemer*, No. 2:15-cv-01928-VEH, 2017 WL 3676034, at \*7 (N.D. Ala. Aug. 25, 2017), as support for its argument.  (*Id.*).  The complaint in *Potts* alleged that the plaintiff's "gender was <u>a motivating factor</u>" in an employment decision and that a decision-maker had told the plaintiff "that he did not think that women were equipped for the Public Works Supervisor position."  2017 WL 3676034, at \*7 (emphasis in original).  The *Potts* court found that these two allegations in the complaint put the defendant on notice that the plaintiff was asserting a mixed-motive claim.  *Id.* It further explained, "While this language might support an additional claim, in the alternative, for single motive discrimination, the [c]ourt sees no reason why the inclusion of such language would necessarily foreclose a mixed motive claim."  *Id.* at \*7 n.17.

In this case, Plaintiff's Complaint asserts that her "membership in a protected class was <u>a motivating factor</u> in Defendant's decision to pay her less than similarly situated male employees" and that she "received lower pay and raises" compared to Railsback, Tutt, and Bertanzetti.  (Doc. # 1 at ¶¶ 53-54) (emphasis added).  Based upon the clear analysis in *Potts* (the case Defendant cited as support for its argument that Plaintiff did not properly assert a mixed-motive claim), this language put (1) Defendant on notice that Plaintiff was asserting a mixed-motive claim and (2) may also support an alternative single-motive claim.  *See Potts,* 2017 WL 3676034, at \*7, \*7 n.17.  As such (and based on Defendant's cited case law), the court assumes that Plaintiff has asserted a mixed-motive Title VII claim and examines the merits of that claim, in turn.

"[A]n adverse employment action motivated by both legal and illegal reasons constitutes actionable discrimination under Title VII." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). A plaintiff "can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e–2(m)). A plaintiff "can prove a mixed-motive case with direct or circumstantial evidence." *Id.* at 1237 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003)). However, it is improper to use the *McDonnell Douglas* framework to evaluate a mixed-motive claim at summary judgment. *Id.* at 1238. Rather, "[t]o avoid summary judgment, a plaintiff raising a mixed-motive claim must offer evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [her]; and (2) a protected characteristic was *a* motivating factor for the [employer]'s adverse employment action." *Bowen v. Manheim Remarketing, Inc.,* 882 F.3d 1358, 1364 (11th Cir. 2018) (quoting *Quigg*, 814 F.3d at 1239) (emphasis in original) (internal quotation marks omitted). "In other words, the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision." *Quigg*, 814 F.3d at 1239 (internal quotation marks omitted) (bracketed text in original). Because this case turns on circumstantial evidence, the court examines whether Plaintiff has presented sufficient evidence to support a mixed-motive claim.

Here, Plaintiff offers the following evidence in support of her mixed-motive claim: Bendick's expert opinion, the fact that Gilbert and Whittaker do not conduct or use formal annual evaluations, and UA's purported use of the Mercer System. (Doc. # 48 at p. 37-40). The

court has already addressed the deficiencies in Bendick's expert opinion and finds Plaintiff's formal annual evaluations argument to be, at best, exceedingly weak because there is no indication that Gilbert's and Whittaker's evaluation systems vary when assessing male and female employees. Similarly, Plaintiff's Mercer System argument provides feeble support for her claim as she has acknowledged that UA's pay grades include wide salary ranges and that employees within each pay grade may receive varying salaries based on their different functions. (Docs. # 39 at ¶ 4; 40-6 at p. 26; 48 at ¶ 4). Although not always necessary for a mixed-motive claim to proceed, Plaintiff has not even alleged that decision-makers made any statements that suggest gender-based bias or that bias factored into their decisional process in allocating salary increases. *See Quigg*, 814 F.3d at 1241 ("Statements by the board's members or others involved with the board's decisional process that suggest bias can serve as evidence of discrimination."). And, more generally, she has not proffered evidence that creates a genuine issue of material fact that Defendant actually relied on her gender in making its salary decisions. *See id.* Because Plaintiff has failed to provide sufficient evidence for a reasonable jury to conclude that her gender was a motivating factor for her salary determinations, her mixed-motive claim is due to be dismissed. *See id.* at 1239.

### C. Plaintiff's Title IX Claim Fails as a Matter of Law

"Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's "broad directive that 'no person' may be discriminated against on the basis of gender appears, on its face, to include

employees as well as students." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 520 (1982). Similarly, Title VII prohibits an employer from discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of that individual's sex. 42 U.S.C. § 2000e-2(a). Defendant contends that Plaintiff's Title IX claims are preempted by her Title VII claims because the claims share an identical factual basis and Title VII provides Plaintiff with an available remedy for these same alleged facts. (Docs. # 39 at p. 37-38; 50 at p. 11). Plaintiff counters that private rights of action exist for employees of educational institutions receiving federal funding under both Title VII and Title IX. (Doc. # 48 at p. 41-42).

Neither the Supreme Court nor the Eleventh Circuit has addressed whether Title VII preempts Title IX when a plaintiff is alleging employment discrimination and Title VII provides a parallel remedy. A circuit split exists among the courts of appeals that have decided this question. *Compare Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 861-62 (7th Cir. 1996), *abrogated in part on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009), (explaining that "Title VII provides a comprehensive statutory scheme for protecting rights against discrimination in employment"), *and Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995) ("We are not persuaded that Congress intended that Title IX offer a bypass of the remedial process of Title VII. . . . Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions."), *with Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 560 (3d Cir. 2017) ("Title VII's concurrent applicability does not bar [the plaintiff's] private causes of action for retaliation and *quid pro quo* harassment under Title IX."), *Ivan v. Kent State Univ.*, 92 F.3d 1185, 1185 n.10 (6th Cir. 1996) (overruling a district court's conclusion that Title VII preempts an individual's private remedy

under Title IX), *Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 205-06 (4th Cir. 1994) ("An implied private right of action exists for enforcement of Title IX. . . . This implied right extends to employment discrimination on the basis of gender by educational institutions receiving federal funds."), *and Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896-97 (1st Cir. 1988) (recognizing the private Title IX claim of an employee in a university's medical residency program). The vast majority of the district courts in the Eleventh Circuit that have addressed this issue have held that Title VII preempts Title IX in the employment context. *See, e.g.*, *Morris v. Wallace Cmty. College-Selma*, 125 F. Supp. 2d 1315, 1343 (S.D. Ala. 2001) (holding that the plaintiff's Title IX claim of employment discrimination was precluded by Title VII); *Blalock v. Dale Cnty. Bd. of Educ.*, 84 F. Supp. 2d 1291, 1298 (M.D. Ala. 1999) ("We hold that Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions."); *Hazel v. School Bd. of Dade Cnty.*, 7 F. Supp. 2d 1349, 1354 (S.D. Fla. 1998) ("[T]his Court believes that the line of cases that hold that Title VII is the exclusive remedy for employment discrimination claims on the basis of sex in federally funded educational institutions are the better reasoned cases."); *Gibson v. Hickman*, 2 F. Supp. 2d 1481, 1484 (M.D. Ga. 1998) ("This court agrees with those courts finding that Title VII preempts employment discrimination claims for money damages brought under Title IX.").[19]

---

[19] *See also, e.g.*, *Drisin v. Fla. Int'l Univ. Bd. of Trustees*, No. 1:16-CV-24939, 2017 WL 3505299, at *5 (S.D. Fla. June 27, 2017) ("[T]he Court finds that Plaintiff's Title IX claim against [Defendants] is preempted by Title VII as a matter of law. The weight of authority favors Defendants because there is compelling evidence 'that Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII.'"); *Cooper v. Georgia Gwinnett Coll.*, No. 1:16-CV-01177-TWT-JFK, 2016 WL 6246888, at *6 (N.D. Ga. Sept. 16, 2016), *report and recommendation adopted*, No. 1:16-CV-1177-TWT, 2016 WL 6217124 (N.D. Ga. Oct. 25, 2016) ("Congress did not intend to allow relief under Title IX to offer a bypass to the administrative exhaustion requirements established for relief under Title VII."); *Reese v. Emory Univ.*, No. 1:14-CV-2222-SCJ, 2015 WL 13649300, at *5 (N.D. Ga. Jan. 29, 2015) (finding that "there is not a private right of action for Plaintiff to bring an employment discrimination claim against Defendant Emory University under Title IX"); *Torres v. Sch. Dist. of Manatee Cty., Fla.*, No. 8:14-CV-1021-T-33TBM, 2014

In this case, the court finds it is unnecessary to make a ruling on this preemption issue because the parties agree that Plaintiff's Title IX claim (even if not preempted) should be evaluated on the same basis as her Title VII claim.[20]  (Docs. # 39 at p. 38; 48 at p. 40); *see Lipsett*, 864 F.2d at 896-97.   As such, regardless of whether Plaintiff's Title IX claim is preempted, this claim fails as a matter of law for the same reasons (discussed above) that Plaintiff's Title VII claims fail.  Because Plaintiff's Title IX claim fails as a matter of law, even if it is not preempted, the claim is due to be dismissed.

## V.      Conclusion

For all of these reasons, the court concludes that Defendant's Motion for Summary Judgment (Doc. # 38) is due to be granted.  An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this July 17, 2018.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

WL 4185364, at *4 (M.D. Fla. Aug. 22, 2014) (*"The Court determines that such a private right of action does not exist under Title IX because it is preempted by Title VII of the Civil Rights Act of 1964."*); *Tompkins v. Barker*, No. 2:10-CV-1015-MEF, 2011 WL 3583413, at *5 (M.D. Ala. July 26, 2011), *report and recommendation adopted*, No. 2:10-CV-1015-MEF, 2011 WL 3584306 (M.D. Ala. Aug. 15, 2011) ("The undersigned can conceive of no reason why Congress would intend that a plaintiff-employee of a federally funded education institution be allowed to circumvent the unique legal and administrative requirements imposed on employees asserting identical employment discrimination claims under Title VII merely because the plaintiff is employed by a federally funded educational institution."); *Smedley v. Fulton Cty. Sch. Dist.*, No. 1:09-CV-1715-HTW, 2011 WL 13175900, at *3 (N.D. Ga. June 23, 2011) ("[T]he plaintiff cannot use Title IX to bring a gender discrimination claim arising out of his employment."); *Schultz v. Bd. of Trustees of Univ. of W. Fla.*, No. 3:06-CV-442-RS-MD, 2007 WL 1490714, at *3 (N.D. Fla. May 21, 2007) ("[T]he 'precisely drawn, detailed enforcement structure' and 'comprehensive remedial scheme' that is Title VII preempts the more general remedy under Title IX in this case."); *Hankinson v. Thomas Cty. Sch. Dist.*, No. 6:04-CV-71 HL, 2005 WL 6802243, at *2 (M.D. Ga. Oct. 28, 2005) ("[T]his Court agrees with those courts that hold Title VII preempts employment discrimination claims for money damages brought under Title IX."). *But see Shuford v. Alabama State Bd. of Educ.*, 968 F. Supp. 1486, 1503-04 (M.D. Ala. 1997) (analyzing a plaintiff's Title VII and a Title IX claims without discussing the issue of preemption); *Saville v. Houston Cty. Healthcare Auth.*, 852 F. Supp. 1512, 1521 (M.D. Ala. 1994) (same).

[20] Furthermore, although the issue has been preserved, the court finds the one to two pages of briefing on this complicated question of law to be underdeveloped.  (*See* Docs. # 39 at p. 37-38; 48 at p. 40-42; 50 at p. 11).